UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| TONJA AMES,<br><br>        Plaintiff,<br><br>    v.<br><br>KING COUNTY, Washington; Deputies<br>HEATHER R. VOLPE, member of the<br>King County Sheriff's Department;<br>CHRISTOPHER SAWTELLE, member of<br>the King County Sheriff's Department;<br>DANIEL L. CHRISTIAN, member of the<br>King County Sheriff's Department; and<br>DOES I-V, inclusive, individual employees<br>of King County,<br><br>        Defendants. | Case No. C13-1030RSM<br><br><br>ORDER GRANTING IN PART AND<br>DENYING IN PART DEFENDANTS'<br>MOTION FOR SUMMARY JUDGMENT |

## I.    INTRODUCTION

This matter comes before the Court on Defendants' Motion for Summary Judgment. Dkt. #15.  Defendants seek summary dismissal of all claims made against the Defendants. Plaintiff opposes the motion with respect to the individually-named Defendants, but does not object to the dismissal of the federal claim against King County.  Dkt. #30.  Having reviewed the record before it, and having determined that oral argument is not necessary, the Court GRANTS IN PART and DENIES IN PART Defendants' motion.

ORDER
PAGE - 1

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).   In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (*citing Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992)).   Material facts are those which might affect the outcome of the suit under governing law. *Anderson,* 477 U.S. at 248.

The Court must draw all reasonable inferences in favor of the non-moving party. *See O'Melveny & Meyers*, 969 F.2d at 747, *rev'd on other grounds*, 512 U.S. 79 (1994).   However, the nonmoving party must make a "sufficient showing on an essential element of her case with respect to which she has the burden of proof" to survive summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).   Further, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 251.

## III.   BACKGROUND

The sequence of events leading up to the incident at issue in this case is largely undisputed.   On February 6, 2013, Plaintiff Tonja Ames returned home after work.   Dkt. #31, Ex. G at 8:15-18.   At the time, she lived in a single family home in Woodinville, where her 22-year-old son, Colin Briganti, also lived in an apartment over the garage. *Id.* at 6:16-7:7.   Colin had lived in the apartment since 2012 when he became ill with a heart condition as a result of a history of drug addiction. *Id.* at 7:4-17.   As was her typical routine, Ms. Ames called her son.

ORDER
PAGE - 2

He did not answer the phone.  She tried calling again, and when he still did not answer, she went over to check on him.  *Id.* at 8:15-22.

Ms. Ames opened the apartment door, but did not immediately see Colin.  She walked further in and saw him slumped over on the couch drooling.  Dkt. #31, Ex. G at 8:23-25.  She was concerned because she was trying to speak with him and he was not coherent.  *Id.* at 8:25-9:2.  She looked around for evidence of use of drugs, and, while doing so, saw a note.  *Id.* at 9:3-18.  She briefly looked at the note, determined that it was "not good," and called her neighbors, Bill and Linda Eby, for help.  *Id.* at 9:18-22.

Ms. Ames then called 911.  Dkt. #33 at ¶ 4 and Dkt. #31, Ex. G at 10:9-10.  Ms. Ames informed the dispatcher that she needed an ambulance for her son.  Dkt. #20, Ex. A at 2:3-13.  The dispatcher asked if her son was conscious, to which Ms. Ames responded, "Barely.  It looks like he overdosed on some medication."  *Id.* at 2:22-3:1.  The dispatcher asked if it was an intentional overdose, to which Ms. Ames replied, "Yes, there is a note here left for me."  *Id.* at 3:7-12.  *See also* Dkt. #31, Ex. G at 10:11-25.  The dispatcher classified the call as "Priority: 1 Type: SUICD – Suicide Attempt."  Dkt. #31, Ex. I.  The dispatcher called for medical aid, and noted a 22-year-old male, "intentional OD w/suic note left behind."  Dkt. #31, Ex. I.

King County Sheriff's Deputy Heather Volpe was dispatched with an aid crew from Woodinville Fire and Rescue.  Dkt. #31, Ex. I.  It is common practice for law enforcement to accompany medics when responding to attempted suicide calls to ensure the safety of the aid crew.  Dkts. #22 at ¶ 3 and #18 at ¶ 4.  At 6:34, Deputy Volpe and the aid crew arrived at Ms. Ames' home.  Dkt. #31, Ex. I.  The aid crew included Lt. Drago Nevestic, Firefighter/EMT Chris Mezzone, and Firefighter/EMT Larry Laurent.  Dkts. #21, #22 and #23.  Mr. and Mrs. Eby had arrived prior to the aid crew and Deputy.  *See* Dkts. #34 and #35.  Ms. Ames met the

aid crew and Deputy at the front corner of her house.  Dkt. #16, Ex. A at 17:24-18:9.  She gave

them a full account of her son's medical history and led them to the door of his apartment.  *Id.*

EMT Mezzone and EMT Laurent entered the apartment first and began assessing

Colin's condition.  Dkts. #31, Ex. G at 22:12-14, #21, Ex. A at 3:22-23 and Dkt. #23, Ex. A at

3:16-23.  Colin was "lethargic [and] barely could keep his eyes open."  Dkt. #16, Ex. D at

33:12-13.  Deputy Volpe then attempted to enter the apartment with Lt. Nevestic.  However,

Ms. Ames stopped them, refusing to let Deputy Volpe in.  Dkt. #31, Ex. I.  According to the aid

crew, Ms. Ames became aggressive, shouting at the Deputy and stating, "[t]here are no fucking

cops allowed in my house."[1]  Dkt. #16, Ex. B at 12:2-5 and 55:24-25.

Deputy Volpe was surprised that Ms. Ames would not let her enter.  Dkt. #18 at ¶ 8.

She explained to Ms. Ames that if she could not enter, the EMTs could not treat her son.  Dkt.

#16, Ex. A at 23:3-8.  Ms. Ames said that Deputy Volpe made this statement loud enough for

the EMTs to hear her.[2]  *Id.*  EMT Mezzone, hearing Ms. Ames refuse entry to Deputy Volpe,

stated, "Well, we need to go."  Dkt. #21, Ex. A at 4:8-13.  He then informed EMT Laurent that

---

[1]  According to Plaintiff, the entire audio of the encounter was recorded in real-time.  Dkt. #30 at 5.  The Court, however, has been unable to listen to such recording.  Plaintiff filed a copy of the 911 audio recordings in opposition to this motion.  Dkt. #31, Ex. J.  However, the CD provided is missing all but several seconds of the recordings.  Upon request of the Court, Plaintiff provided a second copy of the audio recordings.   That copy is nearly incomprehensible.  The sound is poor quality, and the recording does not appear to have been copied into separate tracks.  As a result, there is one lengthy track with long gaps of silence between dispatch recordings, making it difficult to follow the chain of events.  Moreover, a portion of the CD appears to contain recordings from an unrelated auto accident.  In any event, both Deputy Volpe and Ms. Ames have testified that Ms. Ames told the Deputy that the EMTs were allowed in the house, but not her.  Dkts. #18 at ¶ 7 and #16, Ex. A at 22:12-23:1.

[2]  Ms. Ames has since re-characterized the interaction with Deputy Volpe, stating that Deputy Volpe shouted and yelled.  Dkts. #30 at 5 and #33 at ¶ 7.  For purposes of this motion, the Court accepts as true that Deputy Volpe spoke in a loud voice.  The Court also notes that a declaration made by the non-moving party after the filing of a motion for summary judgment may be disregarded if it contradicts the party's earlier deposition testimony.  *Addisu v. Fred Meyer*, Inc., 198 F.3d 1130, 1138 & n. 6 (9th Cir. 2000).

ORDER
PAGE - 4

he needed to back out for safety purposes, and they both returned to the aid car.  *Id.* at 4:13-17.
Mrs. Eby, who overheard the conversation, corroborates EMT Mezzone's testimony, although
both Mr. and Mrs. Eby state that Deputy Volpe ordered the EMTs out of the house.  Dkts. #34
at ¶ 8 and #35 at ¶ 7.

After they left the house, the EMTs called for a paramedic unit, recognizing that Colin
required Advanced Life Support.  Dkt. #16, Ex. E at 21:18-22:15.  They remained waiting
outside the house by their vehicle.  Deputy Volpe also retreated.  She informed her Sergeant,
Kevin Johannes, that she was being refused entry and requested that back-up units be
dispatched to assist her.  Dkts. #18 at ¶ 8 and #31, Ex. I.

In the meantime, Ms. Ames, along with Mr. and Mrs. Eby, carried Colin out of the
house and loaded him into Ms. Ames' truck, apparently so that Ms. Ames could transport Colin
to the hospital herself.  Dkts. #31, Ex. G at 27:2-4, #34 at ¶ ¶ 9-10, and #35 at ¶ 8.  Ms. Ames
also took the note Colin had left and put it in the truck so that she could give it to the people in
the ER.  Dkt. #16, Ex. A at 41:7-11.  Deputy Volpe watched this, and noticed that Colin
appeared completely unconscious.  She radioed her Sergeant to tell him that it looked like Ms.
Ames was attempting to transport Colin to the hospital herself.  Dkts. #31, Ex. I and #18 at ¶ ¶
11-12.  After consulting with Sergeant Johannes, Deputy Volpe moved her patrol vehicle to
block Ms. Ames from leaving her driveway.  Dkt. #18 at ¶ ¶ 11-12.

Ms. Ames heard Deputy Volpe tell her that it was unlawful for her to take her son
anywhere.  Dkt. #16, Ex. A at 41:17-18.  Ms. Ames yelled back, "Move your vehicle.  You
won't help my son."  Dkt. #16, Ex. A at 41:20-21.  Deputy Volpe responded that she was not
going to let Ms. Ames go anywhere.  *Id.* at 41:21-22.  EMT Mezzone heard the exchange.  He
recalls that Deputy Volpe was calm and professional.  He also recalls hearing her say that Colin

needed immediate attention from the aid crew.   Dkt. #16, Ex. B at 56:13-20.   Ms. Ames admitted to Sergeant Johannes that she heard Deputy Volpe tell her that she needed to let the EMT take her son.  Dkt. #20, Ex. B at 5:10-16.

When Deputy Volpe refused to move her car, Ms. Ames became angry.  She demanded that Deputy Volpe "move [her] fucking vehicle."  Dkt. #16, Ex. A at 41:23-25.  She then proceeded to get into her truck and started to put her keys in her ignition.  Before she could do anything further, she felt hands on her hair.  *Id.* at 42:2-18.  Deputy Volpe, in order to prevent Ms. Ames from taking control of her vehicle, had inserted herself between the truck door and the door frame.  Dkt. #18 at ¶ 15.  Deputy Volpe asserts that Ms. Ames struck her several times with the truck door in an effort to close it.  *Id.*  Ms. Ames does not describe any effort to close the truck door.  Deputy Volpe states that she verbally commanded Ms. Ames to get out of the vehicle, but Ms. Ames ignored the commands, leading Deputy Volpe to engage in a use of force to remove her.  It does appear that they struggled with each other as Deputy Volpe attempted to remove Ms. Ames from the vehicle.  During the interaction, Colin sat motionless in the truck with his head slumped over to one side.  *Id.*

Deputy Volpe, in an effort to distract Ms. Ames and gain control, grasped Ms. Ames' hair near her scalp.  *Id.* at ¶ 17.  This caused Ms. Ames to let go of the steering wheel, which allowed Deputy Ames to pull her out of the truck, bring her to the ground and handcuff her. The EMTs who witnessed this interaction and Lt. Nevestic described Ms. Ames as combative. Dkt. #16, Exs. B at 28:9-23 and Ex. E at 32:10-13.  They also noted that Deputy Volpe moved swiftly and smoothly, and did not appear to be slamming or pounding on Ms. Ames.[3]  *Id.*

---

[3]   Ms. Ames states that she was "brutally yanked" out of her truck and that her face was "slammed" into the gravel. Dkt. #30 at 7. Mr. Eby testifies that he was buckling Colin into the seatbelt, and "a moment later . . . saw Ms. Ames lying face down on the gravel driveway,"

ORDER

PAGE - 6

After Ms. Ames had been handcuffed, she began complaining that she was having trouble breathing.  Dkt. #18 at ¶ 18.  Ms. Ames also informed Deputy Volpe that she had been previously paralyzed and had two back surgeries and was in a lot of pain.  Dkt. #33 at ¶ 13-15.  Deputy Volpe told her to lay on her side to help with her breathing.  She also stated that she would stop applying pressure to Ms. Ames' back if Ms. Ames remained on the ground.  Dkt. #18 at ¶ ¶ 18-19.  Ms. Ames was subsequently moved to the back of a patrol car.

In the meantime, paramedics began administering aid to Colin.[4]  Dkt. #16, Ex. B at 35:25-55:4.  By then, Deputies Daniel Christian and Christopher Sawtelle had also arrived.  Dkt. #19 at ¶ ¶ 4 and 8.  Deputy Sawtelle believed the truck was a possible overdose scene based on information he had learned that Colin had been in the truck and the alleged suicide note was in the truck.  Dkt. #19 at ¶ ¶ 5-6.  Accordingly, he and Deputy Christian searched the truck, without obtaining consent from Ms. Ames.  *Id.* at ¶ 8.  They found the note in the truck, in plain view between the seats.  *Id.* at ¶ 8 and Ex. B.  Inside the glove box they found a loaded handgun and various prescription pills.  *Id.* at ¶ 9 and Ex. C.

Deputy Volpe had reported her use of force against Ms. Ames, so Sergeant Johannes arrived to investigate.  Dkt. #20 at ¶ ¶ 5-6 and Ex. B.  Ms. Ames reported abrasions to her hands, that her wrist was "messed up," and that her right knee and left rib cage were also sore.  Dkts. #20, Ex. B at 6:24-25:12 and #37, Ex. A.  Ms. Ames was released at the scene.

## IV.    DISCUSSION

### A.  Legal Standard for Violations of 42 U.S.C. § 1983

Plaintiff has brought a number of claims against Defendants under 42 U.S.C. § 1983, alleging that:

---

while Mrs. Eby testifies that she saw Deputy Volpe "yank" Ms. Ames' face down to the ground.  Dkt. # 34 at ¶ 12 and #35 at ¶ 10.
[4] Colin was transported to the hospital after he was stabilized.  Dkt. #16, Ex. E at 28:3-11.

1) Deputy Volpe violated Ms. Ames Fourth Amendment rights by arresting her without probable cause (Dkt. #1 at ¶ ¶ 37-41);

2) Deputy Volpe violated Ms. Ames' Fourth Amendment right to be free from excessive force during that arrest (Dkt. #1 at ¶ ¶ 42-45);

3) Deputy Volpe violated Ms. Ames' Fourth Amendment rights by conducting an unreasonable seizure (Dkt. #1 at ¶ ¶ 46-49);

4) Deputies Volpe, Sawtelle and Christian violated Ms. Ames' Fourth Amendment rights by conducting an unlawful search (Dkt. #1 at ¶ ¶ 50-52);

5) King County acted with deliberate indifference to Ms. Ames' rights by failing to adequately train its Deputies (Dkt. #1 at ¶ ¶ 53-61); and

6) Deputy Volpe violated Ms. Ames' First Amendment rights by retaliating against her for refusing to let her enter her home (Dkt. #1 at ¶ ¶ 62-65).

For the reasons discussed below, the Court finds that Deputy Volpe is entitled to qualified immunity on all but one federal claim. The Court further finds that Deputies Sawtelle and Christian are not entitled to qualified immunity on the federal claims against them. Finally, the federal claim against King County is dismissed.

### 1. Qualified Immunity Under Federal Law

Government officials and law enforcement officers are entitled to qualified immunity if they act reasonably under the circumstances. *Wilson v. Layne,* 526 U.S. 603, 614 (1999). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986). The traditional determination of whether an officer is entitled to summary judgment based on the affirmative defense of qualified immunity required applying a three-part test. *Saucier v. Katz*, 533 U.S. 194, 201-02, 121 S. Ct.

ORDER
PAGE - 8

2151 (2001).  Under *Saucier*, courts were required to first ask whether "[t]aken in the light most favorable to the party asserting the injury, [ ] the facts alleged show the officer's conduct violated a constitutional right?"  *Id.* at 201.  If the answer was no, the officer was entitled to qualified immunity.  If the answer was yes, the court was required to proceed to the next question: whether the right was clearly established at the time the officer acted.  *Id.* at 201-202.  If the answer was no, the officer was entitled to qualified immunity.  If the answer was yes, the court was required to answer the final question: whether the officer could have believed, "reasonably but mistakenly . . . that his or her conduct did not violate a clearly established constitutional right." *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001).  If the answer was yes, the officer would be entitled to qualified immunity.  If the answer was no, he is not.  *Skoog v. County of Clackamas*, 469 F.3d 1221, 1229 (9th Cir. 2006).

However, the United States Supreme Court has since modified this standard.  *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 172 L. Ed.2d 565 (2009).  In *Pearson*, the Court examined *Saucier* and held that reviewing judges are now permitted to exercise their discretion in deciding which of the first two prongs of the qualified immunity analysis should be addressed first in each particular case.  *Pearson*, 555 U.S. at 241-42.  This is because "the judges of the district courts and courts of appeals are in the best position to determine the order of decision-making [that] will best facilitate the fair and efficient disposition of each case." *Id.* at 242.  The United States Supreme Court has also provided additional guidance under *Ashcroft v. al-Kidd*, ___ U.S. ___, 131 S.Ct. 2074, 179 L. Ed.2d 1149 (2011).  In *al-Kidd*, the Court explicitly set forth the high burden on a plaintiff to defeat a summary judgment motion for qualified immunity.  Indeed, to show that a right was clearly established at the time of the alleged constitutional violation, a plaintiff must point to "existing precedent [that places] the

ORDER
PAGE - 9

statutory or constitutional question *beyond debate*". *al-Kidd*, 131 S. Ct. at 2083 (emphasis added). However, if no such single controlling authority exists, there must be a "robust 'consensus of cases of persuasive authority'" that defines the contours of the rights in question with a high degree of particularity. *See id.* at 2084 (citation omitted).

> ## 2. *Alleged Fourth Amendment Violations Against Deputy Volpe*
>
> ### a. Probable Cause for Arrest

The Court first addresses Plaintiff's allegation that Deputy Volpe violated her Fourth Amendment rights by arresting her without probable cause. Defendants acknowledge that Plaintiff was arrested, but assert that no constitutional violation occurred because the arrest was justified under the Deputy's community caretaking responsibilities and there was probable cause in any event. Dkt. #15 at 13-19.

The Supreme Court has continuously confirmed that a warrantless entry into a home to assist persons who are "seriously injured or threatened with such injury" does not run afoul of the Fourth Amendment. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 126 S.Ct. 1943, 1947 (2006); *Mincey v. Arizona*, 437 U.S. 385, 392, 98 S. Ct. 2408 (1978). Officers performing a "community caretaking" function, providing protection in emergencies, may enter a home without violating the Fourth Amendment. *See Brigham City*, 126 S.Ct at 1947; *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973). The Ninth Circuit has also referred to the "community caretaking" function as the "emergency doctrine." *See United States v. Stafford*, 416 F.3d 1068, 1073 (9th Cir. 2005) ("The emergency doctrine is based on and justified by the fact that, in addition to their role as criminal investigators and law enforcers, the police also function as community caretakers.").

However, *Brigham City* did not make clear whether the "community caretaking" exception for entry and search applies to warrantless arrests under the *Fourth Amendment*. While the Ninth Circuit has also not explicitly extended the "emergency doctrine," or "community caretaking," exception to warrantless arrests, District Courts in this Circuit have, and other circuits have also held that the "community caretaking" function applies to arrests as well as searches. *See Goldsmith v. Snohomish County*, 558 F. Supp.2d 1140, 1151-52 (W.D. Wash. Feb. 15, 2008); *Graham v. County of L.A.*, 2012 U.S. Dist. LEXIS 100470 (C.D. Cal. July 19, 2012); *see also Stricker v. Twp. Of Cambridge*, 710 F.3d 350 (6th Cir. 2013); *United States v. Rideau*, 949 F.2d 718, 720 (5th Cir. 1991), *vacated on other grounds*, 969 F.2d 1572 (5th Cir. 1992); *Winters v. Adams*, 254 F.3d 758 (8th Cir. 2001); *United States v. King*, 990 F.2d 1552, 1560-61 (10th Cir. 1993). Thus, this Court finds reason to extend the "community caretaking" exception to the Fourth Amendment to this matter.

Deputy Volpe accompanied the paramedics to a potential suicide scene to ensure their safety while treating the victim. When Ms. Ames violated verbal commands to leave her vehicle and attempted to take Colin to the hospital herself, Deputy Volpe briefly arrested her for the sole purpose of enabling paramedics to render necessary medical aid. As this Court has previously determined, this fits squarely with the logic of *Brigham City*. *Goldsmith v. Snohomish County*, *supra*, at 1151-52. Likewise, this Court is particularly persuaded by the reasoning set forth by the Sixth Circuit in *Stricker*, *supra*, which found the arrest of a parent in a similar situation constitutional. *Stricker*, 710 F.3d at 35362-63. The Court is also persuaded by the reasoning and logic of the Fifth, Eighth, and Tenth Circuits, who have also held that arrests as part of an officer's "community caretaking" function are exceptions to the *Fourth Amendment's* warrant requirement. *See*, *supra*. Accordingly, the Court finds that the arrest

ORDER
PAGE - 11

was constitutional under the "community caretaking" exception, and therefore Deputy Volpe is entitled to qualified immunity on this claim.

> b.  Unreasonable Seizure

For the same reasons set forth above, the Court determines that Ms. Ames' seizure was constitutional, and therefore Deputy Volpe is also entitled to qualified immunity on that claim.

> c.  Excessive Force and Reasonableness

The Court next turns to Plaintiff's allegation that she was subjected to excessive force during her arrest in violation of the Fourth Amendment rights. To determine whether the force used during arrest was reasonable, the Court examines whether the officer's actions are "objectively reasonable" in light of the facts and circumstances confronting them. *Graham v. Connor,* 490 U.S. 386, 397, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). This inquiry "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Id.* at 396-97. As such, reasonableness is evaluated "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011) (citing *Graham*, 490 U.S. at 397). Police officers "need not avail themselves of the least intrusive means of responding"; rather, they need only act "within that range of conduct [identified] as reasonable." *Billington v. Smith*, 292 F.3d 1177, 1188-89 (9th Cir. 2002). Further, "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight .

ORDER
PAGE - 12

. . . Not every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396-97.

The excessive force analysis involves three steps. First, a court must "assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted." *Glenn*, 673 F.3d at 871. Second, a court must "evaluate the government's interest in the use of force." *Id.* At a minimum, three factors inform the government's interest: "(1) how severe the crime at issue is, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Lal v. California*, 746 F.3d 1112, 1117 (9th Cir. 2014). Of these, the most important is whether the suspect posed an immediate threat to the safety of the officers or others. Id.; *see also Glenn*, 673 F.3d at 872. Finally, a court must "balance the gravity of the intrusion on the individual against the government's need for that intrusion." *Id.*

Applying these rules to the incident at issue, the Court finds that a jury could reasonably find that Deputy Volpe's use of force was excessive. With respect to the *Graham* factors, the Court finds that all three factors weigh in favor of Ms. Ames. First, the severity of the crime at issue is minimal. Even assuming that Ms. Ames could have been charged with obstruction, which to some degree can be considered egregious, obstructing a law enforcement officer is a gross misdemeanor under Washington law. *See* RCW 9A.76.020(3). In addition, Ms. Ames was not involved in an underlying crime at the time of her arrest.

Second, whether Ms. Ames posed an immediate threat to the safety of officers or others is also in question. This factor is considered as the most important single element of the three specified factors. *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994). While Ms. Ames admits

ORDER
PAGE - 13

that she was angry and yelled at Deputy Volpe to move her vehicle, there is no evidence that Ms. Ames advanced toward Deputy Volpe or that she had started her car in motion toward the Deputy.  In fact, Deputy Volpe acknowledges that she got to the vehicle before Ms. Ames could start it.  Dkt. #18 at ¶ ¶ 13-15.  While all were concerned about Colin's condition, and Deputy Volpe asserts she was worried that he would die before Ms. Ames could reach the hospital, Ms. Ames indicated that she was attempting to take her son to the hospital for help, and believed she could get there in ten minutes.  Dkt. #33 at ¶ 9.

With respect to the third *Graham* factor, the Court likewise finds that whether Ms. Ames was resisting arrest at the time Deputy Volpe removed her from the vehicle is in question.  While the Court does not find Deputy Volpe's arrest of Ms. Ames unlawful, whether she needed to use the force she used is a separate inquiry.  Both parties offer evidence supporting their positions.  Ms. Ames states that Deputy Volpe engaged in force before she even knew what was happening, while Deputy Volpe argues that Ms. Ames was actively resisting.  While Deputy Volpe and the EMTs describe a controlled, professional and smooth arrest, Ms. Ames  and Mrs. Eby describe something quite different.  Dkt. #16, Ex. A at 41:12-44:19 and Dkt. #35 at ¶ 10.  Thus, a jury must resolve the factual discrepancies and summary judgment would be improper.

Ultimately, the Court notes that summary judgment should be granted sparingly in excessive force claims.  *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002) ("Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.").  This is because police misconduct cases "almost always turn on a jury's

ORDER
PAGE - 14

credibility determinations." *Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003).  The facts of this case are no different.  In the absence of any conclusive, objective evidence that Deputy Volpe's use of force was justified, the Court cannot find as a matter of law that Ms. Ames' Fourth Amendment constitutional right to be free from excessive force was not violated.   Therefore, Ms. Ames' excessive force claim survives this stage of the proceedings.

> d.   <u>Unlawful Search</u>

Finally, Plaintiff turns to the allegation against Deputy Volpe that she unlawfully engaged in a search of Plaintiff's truck after her arrest.  Significantly, Plaintiff fails to provide any evidence to this Court that Deputy Volpe participated in the search of the vehicle or that she directed it in any manner.  *See* Dkt. #30 at 16-19.  Rather, her arguments focus on Deputies Sawtelle and Christian.  *Id.*  Accordingly, this claim is dismissed against Deputy Volpe.

> 3.  *Alleged Fourth Amendment Violation Against Deputies Sawtelle and Christian*

As with Ms. Ames' arrest, Defendants argue that Deputy Sawtelle's and Deputy Christian's search of Ms. Ames truck is justified under the "emergency doctrine."  Dkt. #15 at 19-21.  As the Ninth Circuit has explained, "To determine whether the emergency exception applies, we look to see whether '(1) considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) the search's scope and manner were reasonable to meet the need."  United States v. Jones, 2014 U.S. App. LEXIS 13850 (9th Cir. 2014) (quoting *United States v. Snipe*, 515 F.3d 947, 952 (9th Cir. 2008)).  The fact that an emergency does not ultimately materialize has no bearing.  *Id.* (citing *Michigan v. Fisher*, 558 U.S. 45, 49, 130 S. Ct. 546, 175 L. Ed. 2d 410 (2009)).

ORDER
PAGE - 15

The Court finds there is a question of fact as to whether the emergency doctrine applies in this case. As an initial matter, the Court agrees that under the circumstances, the officers had a reasonable basis to conclude that Colin was in immediate risk of harm due to his deteriorating condition. They knew he had been in the truck, and that the suicide note was in the truck as well. However, whether the scope of the search was reasonable is difficult. Had the Deputies confined their search merely to the cab of the vehicle, it would be an easier question. But they also chose to search the glove box. Although they claim to have been motivated by the desire to find any medications he may have taken, in order to assist the EMTs in their life-saving measures, there is no evidence that Colin took any medications in the vehicle. Indeed, Ms. Ames had been in her vehicle at work at the time Colin had taken any medications, as she arrived home to find him barely conscious and drooling. The EMTs had already been in the house where they also found him in that condition. No one reports seeing Colin take any medication in the vehicle after Ms. Ames and her neighbors placed him there. In fact, Deputy Volpe stated he was motionless the entire time. As a result, the Court cannot conclusively find that Ms. Ames' Fourth Amendment right to be free from an unlawful search was not violated. Accordingly, Ms. Ames' unreasonable search claim survives this stage of the proceedings.

### 4. Alleged Monell Claim Against King County

Plaintiff has alleged that King County acted with deliberate indifference to Ms. Ames' rights by failing to adequately train its Deputies, making them liable to her for her injuries under *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 98 S. Ct. 2018 (1978). Dkt. #1 at ¶ ¶ 53-61. Defendants move to dismiss this claim on the basis that Plaintiff has failed to specifically identify any custom, policy or practice of King County that violates her rights. Dkt. #15 at 22. Plaintiff does not oppose the dismissal of this claim. Dkt. #30 at 22.

ORDER
PAGE - 16

Accordingly, the Court GRANTS Defendants' motion with respect to this claim and it will be dismissed.

### 5. *Plaintiff's First Amendment Retaliation Claim*

Plaintiff has also brought a claim under the First Amendment, arguing that Deputy Volpe retaliated against her refusal to allow the Deputy into her house by using excessive force against her.   In order to establish a claim of retaliation in violation of the First Amendment, Ms. Ames must demonstrate that Deputy Volpe's conduct would chill a person of ordinary firmness from future First Amendment activity.  *Ford v. City of Yakima*, 706 F.3d 1188, 1193 (9th Cir. 2013).   In addition, the evidence must enable Ms. Ames to ultimately prove that Deputy Volpe's desire to chill her speech was a but-for cause of her allegedly unlawful conduct.  *Id.* (citations omitted).  In other words, would Deputy Volpe have arrested Ms. Ames but for her desire to punish Ms. Ames for her refusal to let the Deputy into her home?

Assuming, without finding, that Deputy Volpe's conduct could have a chilling effect on an ordinary person, there is no evidence to support Ms. Ames' contention that she was arrested solely out of Deputy Volpe's desire to chill her speech, or that Deputy Volpe used excessive force during the arrest for the same purpose.  Indeed, there is no evidence suggesting that Deputy Volpe's actions were motivated by anything other than a desire to prevent Ms. Ames from leaving so that Colin could receive immediate care from the EMTs on the scene.  As the Ninth Circuit has cautioned, it is important for the Court to "strike an appropriate balance between protecting First Amendment rights, on the one hand, and protecting government

officials from the disruption caused by unfounded claims, on the other." *Skoog v. Cnty. Of Clackamas*, 469 F.3d 1221, 1232 (9th Cir. 2006). Accordingly, this claim is also dismissed.

**B. Plaintiff's State Law Claims**

In addition to the federal claims identified above, Plaintiff has also asserted a number of claims against Deputy Volpe under Washington State law, including: assault, battery, false arrest and false imprisonment, and seeks the liability of King County on those torts under the theory of *respondeat superior*. Dkt. #1 at ¶ ¶ 66-78. The Court addresses each of these in turn, below.

*1. Assault and Battery*

As noted above, the Court finds questions of fact for a jury to determine with respect to Ms. Ames' excessive force claim. Ms. Ames' assault and battery claims under Washington State law rest on the argument that Deputy Volpe's use of force during arrest was unreasonable. Accordingly, for the same reasons discussed above, these state law claims also survive summary judgment.

*2. False Arrest and False Imprisonment*

Plaintiff has failed to respond to Defendants' arguments with respect to her claims for false arrest and false imprisonment. *See* Dkts. #15 at 23-24 and #30. When a party fails to respond to a motion, the Court may consider that failure as an admission that the motion has merit. Local Civil Rule 7(b)(2). Moreover, this Court has already determined that Ms. Ames' arrest was not unlawful. Accordingly, these state law claims are dismissed.

*3. Respondeat Superior Liability*

Plaintiff alleges that King County should be found liable for Deputy Volpe's actions under the theory of *respondeat superior*. An employer is responsible for an employee's

ORDER
PAGE - 18

actions only when the employee "acts within the scope of his or her employment in furtherance of the [employer's] business." *Kuehn v. White*, 24 Wn. App. 274, 277, 600 P.2d 679 (1979). Thus, an employer is not liable when an employee commits an assault to "effect a purpose of his or her own." *Thompson v. Everett Clinic*, 71 Wn. App. 548, 551, 860 P.2d 1054 (1993), review denied, 123 Wn.2d 1027 (1994). Ms. Ames has not presented any evidence that in assaulting her, Deputy Volpe was acting in furtherance of the King County Sheriff's Office normal business. In fact, as discussed above, she has consented to the dismissal of King County on her section 1983 claim against it, and she has alleged that Deputy Volpe arrested Ms. Ames in retaliation for exercising her First Amendment rights. Accordingly, the Court finds no basis to find liability against King County, and therefore dismisses the County as a Defendant on the remaining state law claims.

## V.    CONCLUSION

Having reviewed the Defendants' motion for summary judgment, the response in opposition thereto and reply in support thereof, along with all supporting declarations and exhibits and the remainder of the record, the Court hereby finds and ORDERS:

1. Defendants' Motion for Summary Judgment (Dkt. #15) is GRANTED IN PART and DENIED IN PART.

2. Plaintiff's Causes of Action 1, 3, 4, 6 and 9 against Defendant Volpe are DISMISSED in their entirety. Plaintiff's Causes of Action 2, 7 and 8 against Defendant Volpe shall proceed to trial.

3. Plaintiff's Cause of Action 4 against Defendants Sawtelle and Christian shall proceed to trial.

ORDER
PAGE - 19

4.  Plaintiff's Causes of Action 5, 7, 8, 9 and 10 against Defendant King County are

DISMISSED in their entirety, and King County is DISMISSED as a Defendant to

this action.

DATED this 10 day of November, 2014.


RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

ORDER
PAGE - 20